COURT OF APPEALS
DECISION
DATED AND FILED

August 20, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2023AP283-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2019CF658

IN COURT OF APPEALS
DISTRICT I

---

STATE OF WISCONSIN,

       PLAINTIFF-RESPONDENT,

  V.

TERRON ANTHONY CLAYBORN,

       DEFENDANT-APPELLANT.

---

APPEAL from a judgment and an order of the circuit court for Milwaukee County: JEFFREY A. WAGNER and GLENN H. YAMAHIRO, Judges. *Affirmed*.

Before White, C.J., Donald, P.J., and Geenen, J.

¶1 WHITE, C.J. Terron Anthony Clayborn appeals from a judgment of conviction for hit and run resulting in death and knowingly operating a motor vehicle while suspended causing death and the order denying postconviction

relief. Clayborn argues that he should be permitted to withdraw his guilty pleas because they were not entered knowingly, voluntarily, and intelligently but instead induced by a promise from his attorney of a reduced sentence based upon the attorney's relationship with the circuit court judge. After an evidentiary hearing, the postconviction court concluded that while his attorney's representations were inappropriate, Clayborn failed to meet his burden to show manifest injustice if he were not allowed to withdraw his pleas. Upon review, we affirm.

## BACKGROUND

¶2 This case arises out of Clayborn, driving a vehicle while his operating privileges were suspended, striking and killing a City of Milwaukee Department of Public Works (DPW) employee, who was shoveling asphalt to fix potholes in the 1800 block of North 17th Street on February 8, 2019. Clayborn was charged with hit and run resulting in death and knowingly operating a motor vehicle with a suspended license causing death. Attorney Jason Baltz was engaged to represent him, and Clayborn decided to resolve the case with a guilty plea.

¶3 Matters proceeded to a plea hearing on May 1, 2019. The circuit court reviewed Clayborn's signed guilty plea questionnaire and waiver of rights form.[1] The terms of the voluntary pleas on the plea agreement included twelve years of initial confinement, extended supervision left up to the circuit court's discretion, and that the State and Clayborn were free to argue. Both Clayborn and Attorney Baltz signed their assent. The voluntary plea statement included: "I

---

[1] The Honorable Jeffrey A. Wagner presided over Clayborn's plea hearing and sentencing. We refer to Judge Wagner as the circuit court or by name.

2

have decided to enter this plea of my own free will. I have not been threatened or forced to enter this plea. No promises have been made to me other than those contained in the plea agreement."

¶4     The circuit court conducted a thorough colloquy with Clayborn regarding the counts he was charged with, the factual basis of the offenses, the maximum penalties of those offenses, the rights he was waiving, the consequences of being convicted of a felony, and the fact that the court was not bound by the plea agreement. In questioning the voluntary nature of the plea, the following exchange happened:

> THE COURT: Nobody's made any promises or threats to you to plead?
>
> THE DEFENDANT: No, sir.
>
> THE COURT: So this is a voluntary choice on your part to plead guilty to these two offenses?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: And counsel, you're satisfied the defendant's [sic] voluntarily, knowingly, and intelligently waiving those constitutional rights?
>
> MR. BALTZ: I am, Your Honor.

¶5     The circuit court accepted Clayborn's guilty pleas to two counts: hit and run resulting in death and knowingly operating a motor vehicle while suspended causing death. On June 13, 2019, the circuit court sentenced Clayborn, after hearing from the victim's family and a DPW representative, as well as argument from the State and Attorney Baltz. Attorney Baltz reminded the court that from the beginning, Clayborn intended "to accept full responsibility," and to enter a plea and spare the victim's family a trial. Attorney Baltz argued that six

3

years of initial confinement would be sufficient given that the cause of the victim's injuries was unintentional and without malice.

¶6     In the circuit court's sentencing remarks, it gave Clayborn credit for taking responsibility and admitting to the offenses and acknowledged his remorse, repentance, and cooperation. The court also addressed the aggravating factors that Clayborn should not have been driving at all, as he knew he did not have a valid driver's license and had, in the past decade, been cited, charged or convicted fourteen times of municipal citations for operating after suspension or revocation. The court imposed a sentence of twenty-three years, bifurcated as twelve years of initial confinement and eleven years of extended supervision.[2]

¶7     In April 2022, Clayborn filed the underlying postconviction motion for plea withdrawal. He alleged that it would be a manifest injustice if he were not permitted to withdraw his pleas because of the representations, promises, and guarantees Attorney Baltz made regarding his personal relationship with the circuit court. Relying upon the recollections of his girlfriend, Santaira Robinson, and his own recollections of dealing with Attorney Baltz, Clayborn alleged that Attorney Baltz advised him not to substitute on Judge Wagner and to enter a plea because to do otherwise would "hamper his ability to get the judge to do him a

---

[2] The Department of Corrections notified the circuit court in September 2019 that the extended supervision sentence exceeded the maximum allowed by law for a Class D felony. As a result, an amended judgment of conviction was entered, reducing Clayborn's sentence to twenty-two years, bifurcated as twelve years of initial confinement and ten years of extended supervision.

In May 2020, the circuit court denied Clayborn's postconviction motion for resentencing, which was premised on the court not adequately considering whether he was eligible for the challenge incarceration program or the substance abuse program. The court concluded that it had "imposed the minimum amount of confinement time necessary to achieve its sentencing goals of punishment, deterrence and community protection."

favor at sentencing." The postconviction court ordered briefing on Clayborn's claim and ultimately ordered an evidentiary hearing in November 2022.[3]

¶8      At the evidentiary hearing, the postconviction court heard testimony from Attorney Baltz, Clayborn, and Robinson. Attorney Baltz testified that he was engaged by Robinson to represent Clayborn while he was still in fugitive status. Attorney Baltz told Robinson that he clerked for Judge Wagner, who was "very helpful to [his] career," he viewed Judge Wagner "as a mentor and a friend," had "known him personally socially," and was good friends with his son. Attorney Baltz stated that when Clayborn's case was assigned to Judge Wagner, Clayborn expressed that he wanted to substitute on him, but Attorney Baltz informed him that Judge Wagner would be his "preferred judge." During the plea negotiations, Attorney Baltz expected that he would argue for five to eight years of initial confinement. When Attorney Baltz met with Robinson after sentencing, she expressed disappointment about the sentence. Attorney Baltz told Robinson that he could not ask Judge Wagner for a favor. He also told Robinson that he had lunch with Judge Wagner and others shortly before sentencing and he believed the sentencing was "teed up[.]"

¶9      Robinson testified that she met with Attorney Baltz to discuss him representing Clayborn, and when she mentioned that Judge Wagner was the judge on the case, Attorney Baltz told her "that he had a great relationship with Judge Wagner"; they "had been friends for a long time"; "Judge Wagner had attended his wedding"; and "he used to clerk for Judge Wagner back in the day." Attorney

---

[3] The Honorable Glenn H. Yamahiro presided over Clayborn's postconviction evidentiary hearing and denied his motion. We refer to Judge Yamahiro as the postconviction court.

Baltz told her it would be beneficial to hire him because he would "use his relationship with Judge Wagner to his advantage and he will ask Judge Wagner for a favor." She recalled a discussion with Attorney Baltz in February 2019 when Clayborn wanted to substitute on Judge Wagner, but Attorney Baltz told her that staying with Judge Wagner would be "beneficial" to Clayborn. During plea negotiations, Attorney Baltz again told her that even if the plea recommendation was twelve years, he would still be able to ask Judge Wagner for a favor.

¶10    During cross-examination, Robinson testified that she met with Attorney Baltz after sentencing and he said he would not be able to ask Judge Wagner for a favor under any circumstance. Robinson testified that Attorney Baltz did not answer when she asked him what happened to the favor—instead he reiterated that he could not ask for a favor. Prior to the preliminary hearing and over the course of their first phone and in-person meeting, Attorney Baltz explained that if he represented Clayborn, he could ask Judge Wagner for a favor in sentencing of no more than eight years of initial confinement and a closed courtroom for sentencing—no media coverage or presence of the victim's family. Robinson stated that Attorney Baltz offered a "guaranteed promise."

¶11    Clayborn testified that he wanted to substitute judges because he understood Judge Wagner to impose "harsh sentences." He testified that Attorney Baltz told him it would be a bad idea to substitute because Judge Wagner was a friend, he can get a better deal from him, and Attorney Baltz could ask for a favor. He recalled that Attorney Baltz told him to waive the preliminary hearing because if he did not, it would look bad and suggest he was not taking responsibility. When he was informed of the State's plea offer of a recommendation of twelve years of initial confinement, Clayborn said he would rather go to trial and prove it was an accident—but Attorney Baltz said going to trial would be a bad idea and he

6

guaranteed he could ask his friend Judge Wagner for a favor. Clayborn testified that he signed the guilty plea questionnaire and waiver of rights form because Attorney Baltz told him to do so. Clayborn testified that when Judge Wagner asked during the plea colloquy if any promises or threats induced his pleas, Attorney Baltz told him to say no, and Clayborn did so.

¶12 During cross-examination, Clayborn testified that he signed the plea agreement form because Attorney Baltz told him to do so and he did not read it thoroughly. When the prosecutor asked him what his defense at trial would have been, Clayborn described the events as an accident and that the car slipped on black ice. Clayborn acknowledged that he did not stay at the scene of the accident and he did not have a valid driver's license. Clayborn testified that while he affirmed his answers during the plea colloquy, he did not understand what was happening. Clayborn testified that he lied to the court during the plea colloquy, specifically about whether any promises had been made to him.

¶13 The postconviction court issued an oral ruling. It found that Robinson was the "most credible witness in this hearing" with a clear memory. The court concluded that Clayborn made "self-serving statements" and that Attorney Baltz "equivocated a lot of his answers." The court found that "Attorney Baltz … made representations here that were inappropriate regarding his relationship to Judge Wagner." The court referred to Robinson's testimony that Attorney Baltz represented that he had a great relationship with Judge Wagner, he would use their relationship to Clayborn's advantage, and he would ask Judge Wagner for a favor. The court found it significant that Robinson testified that Attorney Baltz did not give a response when she asked what happened to the favor.

¶14    The court also found it significant that while Clayborn testified that he would have rather gone to trial, he did not express he wanted a trial because he was innocent or had a legal issue that needed litigating through trial. The court considered neither Clayborn nor Robinson to be "sophisticated consumers" of the criminal justice system. While Clayborn had numerous traffic citations, he had not been through court on felony charges, for example.

¶15    The court addressed that Clayborn's appeal was premised on "unclean hands."

> [T]here is a certain irony in this entire proceeding that one is going to assert a manifest injustice based upon the fact that there are attempts to secure some kind of unethical and inappropriate bargain did not come to fruition. I dispute, disagree, and did not find the defendant credible when he said I was only lying because my lawyer told me to do so. The defendant is not a ten-year-old. He is a grown man. He is in front of a [c]ourt. He acknowledged that he lied to the [c]ourt throughout the plea colloquy. I understand he is attributing that to guidance given to him and what he was told by Attorney Baltz. That doesn't relieve him of responsibility to tell the truth.

¶16    The court concluded that it would not reward a defendant who "engage[d] in a plan to basically perpetrate a fraud and get a deal that [he was] otherwise not entitled to[.]" The court continued, finding that Attorney Baltz overpromised and noting that he had "no business" promising a specific sentence length. It further determined that the evidentiary hearing on this matter was warranted because Clayborn presented a "compelling explanation" for his untruthfulness during the plea colloquy—the "inappropriate actions of Attorney Baltz." However, the court concluded that Clayborn's claim did not provide "clear and convincing evidence of a manifest injustice" if he were not permitted to withdraw his pleas. The court found that Judge Wagner satisfied his oath to administer justice—he did not give Clayborn a favor because of his relationship

with Attorney Baltz. The court denied Clayborn's motion for plea withdrawal. Clayborn now appeals.

## DISCUSSION

¶17 Clayborn argues that it would be a manifest injustice to not permit him to withdraw his pleas because Attorney Baltz's inducements and promises rendered his plea involuntary. "To withdraw a guilty plea after sentencing, a defendant must show by clear and convincing evidence that a refusal to allow withdrawal of the plea would result in manifest injustice, that is, that there are 'serious questions affecting the fundamental integrity of the plea.'" *State v. Dillard*, 2014 WI 123, ¶36, 358 Wis. 2d 543, 859 N.W.2d 44 (quoting *State v. Denk*, 2008 WI 130, ¶71, 315 Wis. 2d 5, 758 N.W.2d 775). One way a defendant can show manifest injustice is to prove that the plea was not entered knowingly, intelligently, and voluntarily. *State v. Taylor*, 2013 WI 34, ¶24, 347 Wis. 2d 30, 829 N.W.2d 482.

¶18 "A plea not entered knowingly, intelligently, and voluntarily violates fundamental due process, and a defendant therefore may withdraw the plea as a matter of right." *Id.*, ¶25. "Whether a [defendant's] plea was entered knowingly, intelligently, and voluntarily is a question of constitutional fact" that we independently review. *Id.* We uphold the circuit and postconviction court's findings of fact unless the findings are clearly erroneous. *Dillard*, 358 Wis. 2d 543, ¶38.

¶19 Clayborn argues that he has identified a manifest injustice because he would not have pled guilty without the repeated representations of Attorney Baltz that his relationship with Judge Wagner would benefit Clayborn at sentencing. Although there is no Wisconsin law directly on point, we consider

9

three cases illustrative: *State v. Riekkoff*, 112 Wis. 2d 119, 332 N.W.2d 744 (1983), *State v. Dawson*, 2004 WI App 173, 276 Wis. 2d 418, 688 N.W.2d 12, and *Hutchings v. United States*, 618 F.3d 693 (7th Cir. 2010), a case discussed by the postconviction court.

¶20     In *Riekkoff*, the defendant pled guilty with a mistaken understanding of law that he had preserved the right to appellate review of the circuit court's decision to exclude testimony of an expert psychiatric witness. *Id.* 112 Wis. 2d at 121. The court of appeals rejected that the defendant and the State (and by acquiescence, the circuit court) could stipulate a right to appellate review in violation of the general principle that a guilty plea waived all non-jurisdictional issues. *Id.* at 122. Our supreme court concluded that "[u]nder these circumstances, as a matter of law his plea was neither knowing nor voluntary" and allowed him to withdraw his plea. *Id.* at 128.

¶21     In *Dawson*, a defendant argued that his "plea [was] constitutionally infirm because it was induced by a legally impermissible plea bargain." *Id.*, 276 Wis. 2d 418, ¶8. The "plea agreement included a provision that, upon [the defendant's] successful completion of five years probation, the State would move to reopen the case and amend" one of the charges to a lesser charge, allowing him to avoid a felony conviction. *Id.*, ¶¶1, 2, 10. This court concluded that "[a] plea agreement that leads a defendant to believe that a material advantage or right has been preserved when, in fact, it cannot legally be obtained, produces a plea that is 'as a matter of law ... neither knowing nor voluntary.'" *Id.*, ¶11 (quoting *Riekkoff*, 112 Wis. 2d at 128). This court thus concluded that the defendant "must be permitted to withdraw his plea." *Dawson*, 276 Wis. 2d 418, ¶25.

¶22    In ***Hutchings***, the defendant filed a petition for a writ of habeas corpus "after he discovered that the government would not move to reduce his sentence under Federal Rule of Criminal Procedure 35, contrary to what his attorney had allegedly promised him." ***Hutchings***, 618 F.3d at 694.[4]   After sentencing, although Hutchings met with government officials, the government declined to move for a sentence reduction under Rule 35 because Hutchings had not provided substantial assistance to the government. ***Hutchings***, 618 F.3d at 696.   The Seventh Circuit denied Hutchings's claim, finding that Hutchings "did not adequately show that he would not have pled guilty even had his attorney fully explained to him that a Rule 35 motion to reduce his sentence was not guaranteed." ***Hutchings***, 618 F.3d at 697.

¶23    Furthermore, the Seventh Circuit in ***Hutchings*** found that the district court must be able to rely on the defendant's testimony during the plea colloquy, specifically with regard to coercion, mistake, promises, or assurances inducing the plea. ***Id.*** at 695, 699.   In response to Hutchings's claim that he lied when questioned about promises, the Seventh Circuit found "wholly insufficient" Hutching's justification for lying because he thought it was a "secret" deal and "the government and the court wanted to appear to be tough on crime." ***Id.*** at 699. The court concluded that "[j]ustice would be ill-served," and the importance of plea colloquy undermined, if Hutchings were allowed "to renege on his

---

[4] Federal Rule of Criminal Procedure 35 allows the government to move to reduce a sentence for providing substantial assistance to the government. FED. R. CRIM. P. 35(b). Hutchings also argued that his attorney's false guarantee of a sentence reduction under Rule 35 violated his Sixth Amendment right to the effective assistance of counsel. ***Hutchings v. United States***, 618 F.3d 693, 696 (7th Cir. 2010).

representation under oath to the district court that there were no promises made to him to induce his guilty plea." ***Id.***

¶24    We distinguish Clayborn's case from ***Riekkoff*** and ***Dawson*** because those defendants were not acting with hidden or illicit intent, and their pleas were induced by flawed or mistaken legal theory.  In contrast, Clayborn's case is more like ***Hutchings*** in that each defendant acted in secret and alleged he lied during his plea colloquy; however, Hutchings's inducement was still premised on the statutorily authorized Rule 35 process.  Clayborn's claim is even less compelling because there is no statutory authority underlying a "favor" as legal theory.[5]

¶25    We conclude that Clayborn has failed to show it would be a manifest injustice if he were not permitted to withdraw his pleas.  The record reflects that the postconviction court found Robinson's testimony credible, Attorney Baltz equivocal in his answers, and Clayborn and Robinson were not sophisticated consumers of the criminal justice system.[6]  Ultimately, this court is not moved to

---

[5] Clayborn points specifically to the ***Hutchings*** decision that states:  "Absent a showing that his attorney personally directed him to hide the truth from the judge, we simply cannot accept Hutchings's explanation for lying to the court." ***Id.***, 618 F.3d at 699.  Clayborn contends that his testimony showed that Attorney Baltz directed him to lie.  We conclude that Clayborn misunderstands the importance of that sentence.  While Hutchings could have explored the potential impact of a Rule 35 motion, Clayborn could not have discussed the "favor" that he believed Attorney Baltz could ask Judge Wagner to provide.  Therefore, whether Clayborn believed Attorney Baltz directed him to lie or whether Attorney Baltz actually directed him to lie is not dispositive to this claim.  We note that the record reflects that the postconviction court did not find Clayborn "credible when he said [he] was only lying because my lawyer told me to do so."

[6] We note and share the postconviction court's concerns about Attorney Baltz's inappropriate conduct while representing Clayborn.  Nevertheless, a Wisconsin court will not aid a party attempting to enforce an unlawful agreement.  ***See Abbott v. Marker***, 2006 WI App 174, ¶6, 295 Wis. 2d 636, 722 N.W.2d 162 ("A court generally will not aid an illegal agreement, whether executed or executory, but instead leave the parties where it found them.").

12

permit Clayborn to withdraw his pleas based on his attorney failing to deliver on a "favor."

¶26 Clayborn entered into a plea agreement under which the State would recommend a term of twelve years of initial confinement and Clayborn could argue for less time; he received "the benefits of the bargain." *State v. Denk*, 2008 WI 130, ¶78, 315 Wis. 2d 5, 758 N.W.2d 775. The record reflects that Clayborn's plea colloquy was thorough and addressed the points relevant to inducement. "A failure to recognize the implications of a valid plea colloquy would 'debase[ ] the judicial proceeding at which a defendant pleads and the court accepts its plea.'" *State v. Jenkins*, 2007 WI 96, ¶62, 303 Wis. 2d 157, 736 N.W.2d 24 (quoting *United States v. Hyde*, 520 U.S. 670, 676 (1997)). We determine no reason to grant Clayborn relief on this basis.

## CONCLUSION

¶27 For the reasons stated above, we conclude that Clayborn has failed to show manifest injustice if he were not permitted to withdraw his guilty pleas.

*By the Court.*—Judgment and order affirmed.

Not recommended for publication in the official reports.